Good morning, Your Honors. My name is Jeff Benice. I'm counsel for the defendants and appellants in this case. The three issues I'll discuss with you this morning is first, the District Court's grant of summary judgment to the FTC, finding that there were no triable issues of fact on the FTC's Section 5 claim and franchise violation claim. Secondly is the Court's order of disgorgement of attorneys' fees by, in fact, myself, which was an order ancillary to the summary judgment motion. This is, in essence, Your Honor, a fraud case. And it was a fraud case in the sense that a company called Bikini Vending got into the Internet kiosk business in 2003, 2002-2003. The company would manufacture a kiosk. It's a kiosk to be placed, say, in a 7-Eleven. My client was a marketing company. My key client is a gentleman named Charlie Castro. He had been in the payphone business for many years and did that successfully. He got into business in a contractual relationship with Bikini Vending and Mr. Bebalacqua. And the long and short of it is my client created a business opportunity. He had a business opportunity offering prospectus that was prepared by competent counsel at the time, Jenkins and Gilchrist, and he used that to sell business opportunities to third parties who would pay $5,000 to buy the Internet kiosk. Under the contract, Mr. Bebalacqua and Bikini Vending was to manufacture the kiosk and place it. During the year 2003 to the spring of 2004, my client, Mr. Castro, his key employee, Greg Hyde, and his companies, NSD, were provided regular information and reports that this activity of the proper manufacture of the Internet kiosk was occurring. In fact, it was not. In fact, what was occurring is that Mr. Bebalacqua and his companies were misappropriating funds. They were manufacturing some kiosks and putting some kiosks out in the field. At the end of 2003, the spring of 2004, it was discovered, when the fraud was discovered by my clients, that he had placed approximately 300 to 350 kiosks. Wasn't your client also getting some word from the customers that they were not finding kiosks where they expected to find them and were uncertain about what exactly was going on? No. What occurred there, Your Honor, was that in the winter of 2003, there were some clients who had gone to bowling alleys, and there was an agreement with a major bowling alley company to install the kiosks. Those clients had gone to the bowling alleys and discovered their kiosks weren't there. My clients, Mr. Casper and Mr. High, immediately inquired of what was the issue or the reason for the failure for the kiosks to be installed. And Mr. Bebalacqua regularly gave rational explanations, including the particular kiosk wasn't yet installed or that the particular bowling alley facility did not have adequate locations for the kiosks, et cetera. There was always a legitimate explanation given. It was only a few customers out of the majority that my clients, from the accountings that were being provided, believed rightfully that there were installations occurring. The most important issue here, when you look at the evidence, is that, in fact, Mr. Bebalacqua was instructing his key employees, including his CFO, to engage in fraud and conceal from my client the activities. A manager and these three key employees ended up coming to my client in the spring of 2004, when they knew my client had $5 million in his account ready to send over to Bebalacqua. They came to my client and they told him exactly what was occurring and what had occurred over the past 12 months, that there had been active material fraud conducted by Bikini Vending that went so far as when my client, Mr. Castro, would go over to Mr. Bebalacqua's offices, he would go so far as to have out on the loading ramps where the kiosks were loaded onto trucks for installation, he would have kiosks with false designation information on them, with a false designation that it was going to a particular location, that it was working in a particular manner. The Bikini Vending employee, Marcus Lanos, testified about this. And that's what's amazing about this case is that three people who worked for Bikini Vending testified that they, in fact, finally told my client because they were obviously very concerned at the end. When did the clients come to Bebalacqua and Bikini? It was in about 2002. They just were meeting at conventions. What was your client's role in marketing them so that the people were buying these kiosks? Yes. My client marketed the kiosk as a business opportunity. To whom? To third parties. Right, to the people who ultimately were the fraud. Yes, that's correct. So your client's out there providing the victims to the fraud, which you say your client was also a victim of. That's correct. Okay, so what do we do with the information in the record where your client, Mr. Castro, was with Bebalacqua and his representations, I think he said, wanted to make him choke? It sounds like he was party to a misrepresentation that he thought was unfounded about the ability of the company to install, manufacture and install these kiosks, wasn't it? No, no. Well, maybe I'm not understanding you. Mr. Castro, when he discovered the fraud. Which was when? Which was in February, March of 2004, and that's when the three employees came to his office. I think the conversation that Judge Fischer was referring to a moment ago refers to some correspondence and communications between Mr. Castro and Mr. Bebalacqua in late 03. There was a meeting in 03 when Bebalacqua made a grandiose projection and Castro challenged him and said, do you actually have the capacity to do this? At or near the same time, he testified at his deposition, Mr. Castro did that, when Ed made these representations that he could install 20,000 machines in so many years, it made me want to choke. I felt it was reckless. I asked him not to do it and he did it. In November of 03, Mr. Castro received a complaint email from a customer that apparently he never really followed up on. I have no doubt that Mr. Castro was himself a victim of some lies from Bebalacqua, but that really isn't the question the FTC was considering in this case. Well, the issue is, did Mr. Castro actively participate? Did he in a reckless manner disregard an ongoing fraud or did he ignore the truth of what was occurring? And the key here is that when he was, and first of all, I'll answer those questions. It is true that in December, Mr. Castro himself, doing his own internal analysis, was becoming concerned because Mr. Bebalacqua conceded that he was behind installations. I think the number was 200 or 300 installations, 200 or 300. And Mr. Castro went to him and said, Mr. Bebalacqua, and this is in Mr. Castro's declaration and Mr. Heye's, if you need assistance, we have other companies that can help you to get installations made. And this is in the region. Let me, have I got the sort of general overlay right? It was Castro and his companies that had the contractual relationship with the third parties to whom the opportunity was sold. He had either actual complaints on the one hand or intuition on the other that Bebalacqua was feeding him a big story. And yet he continued to sell these opportunities knowing that Bebalacqua was not performing. And he allowed a Chinese wall to be maintained between his operation and Bikini's operation such that it made it basically difficult or impossible actually to find out the truth. But nevertheless went ahead selling. And isn't that the nub of the problem? In terms of timing, the answer is no, and I'll explain why. There is no evidence in the record at all that until the fall of 03 that any issue about a customer complaint ever came up. And as I previously explained, both Mr. Castro and Mr. Heye in their declarations explained what they did. They immediately spoke to Mr. Bebalacqua and given the nature of the business to have a rational response that there wasn't an installation point, we're installing it somewhere else, we're dealing with a customer. That's a rational response. But at that point, Castro was already concerned about the bona fides of Mr. Bebalacqua's representations that he could do this enormous volume. He already had concerns about whether that was true. He had received word from customers that they were uncertain where those kiosks were. He had the Chinese wall so he never investigated it. And from late 03 to early 04 is when he was making a huge amount of money. That's when the bulk of the money came in. No, and that's the bulk of the money that he returned. That's the point. But that was a period of very high sales. He continued making a large number of sales to apparently unwitting customers. I need to really focus on this clearly. All right. There's no evidence in the record at all when you look at the declarations of Mr. Castro and Mr. Heye in any evidence submitted by the FTC to support any suggestion that he knew there was misconduct or fraud or he had a reckless indifference to that in the fall of 03. They're running a business. Well, wait a minute. There's a Chinese wall in place. No, there was not a Chinese wall in place. That's simply not true. Mr. Castro regularly went to the – I'm sorry. I'm just looking at the testimony of Mr. Castro. Let me read it and then you can tell me where the time frame fits. I felt at the time the need for me and Ed to remain separate was essential. Ed's favorite saying was Charlie and I have like a Chinese wall between us. That was his and to some extent that was true. My role was to sell the machines. His role was to install, maintain, service, et cetera. The machinists submit payments to the clients of the machines. We were very careful not to cross those boundaries. That's correct. And that's –  That's not a Chinese wall. Sorry. Don't answer the question. I haven't framed it. I don't want you to answer the wrong question. Do you agree that that testimony is sufficient to establish that there was what Mr. Castro agreed to be a Chinese wall, a separation between the two functions, and that that was in place before the end of 2003, early 2004? Well, I need to explain that there was not a Chinese wall in terms of information or Mr. Castro coming to Bikini Vendee's offices and being given accounting reports such as the March 04 report after the FBI had been contacted by Mr. Castro and after Mr. Castro had, along with the FBI, taped five conversations with Mr. Bebalacqua. Mr. Bebalacqua then sent Mr. Castro an accounting of the units in the field and said there were 3,940 units. This is March 05 – excuse me, 04, after the FBI has become involved at Mr. Castro's urgings. The Chinese wall Mr. Bebalacqua is talking about is in the relationship, the law firm that represented Mr. Castro in the process of the business opportunity had advised Mr. Castro and both – and Mr. Bebalacqua, as I understand it, that Mr. Bebalacqua is the manufacturer. He's not the marketer. And Mr. Castro is the marketer and promoter. He's not the manufacturer. They're not to be – they have separate businesses, separate interests. But there was not a Chinese wall in terms of information at all. That is why the three employees of Bikini Vendee came down to Mr. Castro, including the CFO. Mr. Alex Tanabe testified that he was instructed by Mr. Bebalacqua to conceal – I understand, counsel, but you say, well, we're the manufacturer and they're the – we're the marketer and they're the manufacturer, and there was no Chinese wall about information. Well, information is flowing one way. Is there any effort by your client to validate the accuracy of the information or just – the idea was as long as the manufacturer sends reports, that's enough. No, I think that they – Mr. Greg High would go out and check locations, and he testified about this. He was the employee. He would check locations as part of just his ongoing business of knowing what locations the kiosks were at in California. That's what he did. And, again, it never became a telling issue. It just never did. And when there was an issue about the way – There was nothing – you're saying in this period there was nothing before late 2003. There was nothing to trigger suspicion. No, there just wasn't. There were certainly normal business glitches, but there was no suspicion. I'm running down on time, and I wanted to address the disgorgement issue. Go ahead. Simply placed, I was paid a $350,000 flat fee in January of 2005 to represent Mr. Castro. When I was paid that fee, there was no litigation against him. There was no pending FTC action. There was no freeze order. There was no injunction. I represented – I became – I came into the representation of Mr. Castro with co-counsel, and among other things, I interviewed his prior counsel, Jenkins and Gilchrist, that had prepared the prospectuses. I saw sworn statements provided by the bikini-vending key employees who admitted – I mean, it was – I'd never seen that before when there's potential criminal liability – admitted they defrauded Mr. Castro. There was no issue in my mind that any portion of the sum that he paid to me as an attorney fee was somehow tainted funds. More importantly, he had a very successful business before becoming involved with the FTC. Mr. Briggs, would the fact that the FTC was, you know, pawing around in his activities, that there had been settlement discussions, that his actual immediate prior counsel, Peter Spivak, would have known about it but wasn't contacted, have not reasonably alerted a lawyer that the FTC thought those funds were tainted? I didn't at that time have any impression at all that the FTC thought any funds were tainted. That wasn't an issue. I was paid funds, as my co-counsel were, from funds that my clients and I did my own due diligence through my investigation to determine. Okay. I'm just trying to look specifically at what appears to be or could be interpreted as skirting any knowledge of it by not contacting his immediate prior lawyer, who was Peter Spivak, not Jenkins and Gilchrist. Well, I didn't personally speak to Mr. Spivak. My co-counsel, Goin Forsyth, did. Of course we spoke to Mr. Spivak. There was no issue about that. Mr. Spivak was an attorney who had been having some discussions with the FTC, and there were absolutely discussions. I knew exactly the status, and I had my own independent analysis. And when I have witness statements saying we defrauded Mr. Castro, and Mr. Castro I know has a successful, had been in business for about 10 to 15 years successfully, the fees that he paid to me there was no issue about. Okay. The key issue is that the cases cited by the FTC on the issue of either good faith inquiry, which I made, deal solely with cases in which there was an active freeze order in effect. And I addressed that in reply. There was a freeze order in effect. And even then, the Court allows counsel to be paid fees. The two cases cited involve a freeze order and a second circumstance where an attorney took fees in violation of a preliminary injunction. That's just not what happened here. I had a client come in the door. He had a significant problem. There were no outstanding court orders against him. I spoke to his sophisticated prior counsel, Jenkins and Gilchrest. My co-counsel spoke to his counsel, Peter Spivak. And I independently determined that there was no issue about these funds being tainted. Didn't the district court effectively recognize that by awarding you fees at an hourly rate up until the date of the up Yes. The court awarded me a certain amount of my funds. I think it was about $140,000. I'd have to go back and look at the amount. My subtraction isn't great right now. It was the disgorgement orders for $238,000. I had a flat fee agreement with my client. Understood. And the key is there was no finding that I did anything improper. There was a suggestion that there was no finding of wrongful conduct, and that's because there couldn't be. And it was just, here, give back this sum of money. And the court did allow me to put in my hourly billings, which, in fact, exceeded the flat fee at that time. And the court discounted those hourly billings and gave me back a portion. But the bottom line is that this is — I'm simply a lawyer who a client comes in and he brings me substantial evidence demonstrating that he is not involved in a fraudulent scheme, and he pays me a fee from sources of funds he represents to me, and I see documentation comes from prior successful business operations. Okay. I think we have time. Thank you. Thank you. Good morning, Your Honors. My name is Mark Hegedus for the Federal Trade Commission. May it please the Court. I would like to address at the outset the question of whether or not Mr. Bernice himself had engaged in wrongdoing with respect to the requirement that he return the funds. The Court below assessed or impressed a constructive trust. And under the constructive trust, the wrongdoing occurs when an actor wrongfully takes some money from an innocent victim. That event took place when Mr. Castro took the funds from the consumers. Under constructive trust law, subsequent recipients of those funds may be required to return them if they cannot prove that they are bona fide purchasers for value. And that is where Mr. Bernice failed in proof in terms of showing that he was a bona fide purchaser for value, in that he had noticed that the funds could have been tainted, and he did not undertake an adequate inquiry as to the origin of those funds. Now, with respect to the assail case relied upon by the FTC, we relied upon that case to describe a duty of inquiry on the part of a lawyer when that lawyer has an indication that the funds that may be used to pay him or her may be tainted. It does not stand for the proposition that the duty of inquiry cannot arise from a constructive trust existing on the funds. And, in fact, one of the cases that we cite, McGraw v. Connolly, involved a constructive trust that gave rise to a duty of inquiry on the part of an attorney. And the court then assessed in that case coming out of the Sixth Circuit whether or not the attorney had fulfilled its duty of inquiry. Now, with respect to the duty of inquiry that Mr. Bernice undertook, the court found below that he had not gone far enough. He simply relied upon the statements of his lawyer — excuse me, on the statements of his client, Mr. Castro. And in the assail case, the court there found that that was not adequate. That a lawyer would need to do more than simply rely upon the statements of his client. In addition, you have the fact that the FTC here was alleging that Mr. Castro had engaged in a deceptive scheme, that the monies came from not only Network Services Depot but two other corporations, Network Services Marketing and Sunbelt Marketing, both of which were named in the complaint and both of which were tied to the deceptive conduct of this common enterprise that consisted of Network Services Depot, Network Services Marketing, and Sunbelt Marketing. So — I understand. Are you saying that at the time Mr. Bernice became involved in this, there was an FTC proceeding of record with those entities named? We had not yet filed the case. We had provided Mr. Castro with our draft complaint. We had also written a letter to Mr. Castro explaining our reasonings for why we believe that NSD, Mr. Castro's businesses, and Mr. Castro and Mr. High were liable for violations of the Federal Trade Commission Act as well as the franchise rule. So the information about the extent of our investigation, the extent of our probable case, was known to Mr. Bernice at the time he was retained by Mr. Castro. So he — There's evidence that he saw that letter. I'm sorry? There's evidence that he saw or knew of that letter. He certainly testified he was aware of our discussions and of our case. I don't recall whether or not he has indicated that he, in fact, read the complaint or read the letter, but presumably with Mr. Castro bringing the case to Mr. Bernice, he would have reviewed the papers that had been provided by the FTC to Mr. Castro. The FTC had provided a draft complaint to Mr. Castro or to Mr. Bernice, or to both of them? We had provided it to Mr. Castro and Mr. Spivak. All right. Oh, Mr. Spivak. Mr. Spivak as well. Yes, yes. At the time that these discussions were taking place, Mr. Spivak was representing Mr. Castro with respect to the FTC matter. And as the Court observed, Mr. Bernice did not have a conversation with Mr. Spivak about that case and about what the FTC's negotiations were. And we would argue that as part of his duty of inquiry, he should have had that conversation. He should have dug deeper to determine whether or not the – what were the bases for the FTC's concerns with Mr. Castro's conduct as well as the activities of his corporations. And it's important to note that with respect to the monies that were in the custodial accounts that were used to pay Mr. Bernice's fees, the monies came from three corporations, Network Services Depot, Network Services Marketing, and Sunbelt. And the expert for the FTC, our financial analyst, Mr. Kelly, traced the funds in that – in those accounts to those companies. And so when Mr. Bernice says, well, I had understood that some of that money came from Network Services Marketing or some of that money came from Sunbelt Marketing, that doesn't serve as evidence that those funds are not tainted because we were showing that we had alleged at the time that we were preparing to bring the complaint that those two subsidiaries or sister companies of Network Services Depot were involved in the fraudulent conduct undertaken by Network Services Depot and Mr. Castro. With respect to that fraudulent conduct, the FTC does acknowledge that Mr. Bevilacqua and BBC had a fraudulent scheme. In fact, we brought a case against those entities. But in addition, we showed that Mr. Castro and Mr. High knew that the product that they were selling, these internet kiosks, were not as they were represented to be in the marketing materials, in the offering circular. And that knowledge came from several sources. First of all, as early as late 2002, Mr. Castro sent a letter to the investors reporting on the fact that Mr. Bevilacqua and BBC were behind in installations. At that time, Mr. Castro and NSD had worked on an arrangement with investors in phone kiosks, in telephone pay phones, to have them transfer their investment from pay phones to internet kiosks. And the vehicle for doing that was Sunbelt Marketing. And they ended up having a transfer of between 8 and 1,200 of these phones to kiosks. Mr. Castro was aware that BBC was unable to accommodate that kind of installation and wrote about it. In addition, as the Court recognized, Mr. Castro himself had doubts about whether or not BBC could do the kinds of installations that were promised. He testified about the figures of 20,000 kiosks, and Mr. Bevilacqua was installing that many, making him want to choke. In fact, that figure was in a white paper that was presented to Mr. Castro by Mr. Bevilacqua in late 2001. So the doubts about BBC were sown early on. In addition, it's important to keep in mind that Mr. Castro and his company, NSD, took on the obligation to install. Their contract with the purchasers of these business opportunities said that Network Services Depot would provide an installed internet terminal. And yet, at the same time, Mr. Castro took inadequate steps to ensure that he could install them or that there were even internet kiosks to be installed, going as far as agreeing to this firewall, to this Chinese wall between the two companies. When Mr. Castro did make the inquiries, he simply accepted Mr. Bevilacqua's word. And that was inadequate because of the fact that, number one, he had his own doubts about whether or not Mr. Bevilacqua could do what he said he was going to do, and the fact that, as time went on through 2003, complaints continued to come in to indicate that something was amiss with the installation of these kiosks. The other part of the wrongdoing in an independent basis for finding Mr. Castro and Mr. High and BVD in violation of the Federal Trade Commission Act are the franchise rules violations. And those violations involved failure to include substantiation for the earnings claims that were made by NSD. For example, they were making earnings claims with respect to 12 percent per annum returns, and sometimes these kiosks earning revenues, generating revenues of greater than $1,000 a month. Yes, Network Services Depot says they didn't make earnings claims because of the fact that, in their offering circular, there was a statement that there is no earnings representation here. But it's important to keep in mind that this offering circular was a document that they were required to give, but often either did not give to the investors, or if they gave it to the investors, they gave it to the investors just within a few days of when the investors signed the dotted line. Rather, the declarations of customers and other sales agents indicate that what was influential to the investors was the promise of the 12 percent per annum return. And under FTC law and under cases interpreting the FTC Act, what matters is the net impression on consumers looking at what was presented to them. I lost a thread there. The 12 percent shows up in the offering. The 12 percent. That projection shows up in the written material. That is correct. You said that that was a document that was required to be given to the potential buyer or investor, and yet it was either not given or was given right at the end. So how do those – where does the 12 percent get communicated to the potential buyer or investor if they're not either getting the circular or it's coming so late in the process? The 12 percent was also part of the marketing of this business opportunity. Mr. Castro, and sometimes accompanied by Mr. Bevilacqua, would attend conventions for sales agents for these investors that make PowerPoint presentations regarding this business opportunity. So the information that was being received by the investors, potential investors, was not limited to the offering circular. So it was a marketing pitch, and then it would be confirmed when they're ready to sign, they get the offering circular, and there it is in writing. Well, that certainly was part of the purpose of the offering circulars to provide the confirmation. But having made the pitch, then the FTC's franchise rule required that that offering circular provide substantiation for the pitch, and the offering circular did not do that. There were other violations as well of the franchise rule concerning the fact that BBC was selling – in a franchise-type relationship whereby the franchisor was BBC, and NSD served as a sales agent. The franchisees were the investors. And under the franchise rules, the offering circular should have included information, financial information, about BBC, but it did not. The offering circular should have included information about the kiosks that had been installed and that were operating. Instead, the offering circular included information about the number of kiosks that had been sold. So there was another violation. Another part of the FTC's case below was also the fact that there were misrepresentations about where this money would come from. The revenues that were promised to the investors were revenues that would have come – but were supposed to have come from the usage of these internet kiosks. And in fact, what happened was that the money came from new investors. There were not monies being distributed to the investors based upon the revenues generated by the kiosks. It was just the new money coming in from new investors. So it was very much a classic Ponzi scheme. The payments to the franchisors, the customers, were supposed to, under the contract, come from network services or come directly from Bevilacqua? The payments were to come from Bevilacqua. Under the business opportunity, the business opportunity involves selling the kiosk to the investor. And then the investor, at that point, made a determination of whether or not it wanted to maintain the kiosk itself or hire someone else to do it for them. And the sales pitch between BVC – or with BVC and NSD basically presented BVC as the preferred servicer, if you will, of these internet kiosks. But with respect to the representations that were going out and being made, Mr. Castro himself was making these representations in terms of the income expectations. And he was directly involved in them. So thank you very much to the panel. And if you have no further questions, I appreciate your time. Thank you. Thank you. We appreciate the argument. I'll give you a minute in rebuttal. Thank you. First, as to the disgorgement issue, I had indicated that while I didn't directly speak to Mr. Spivak, my co-counsel – I was co-counsel – Goin' Foresight did. That's what they did. Are you aware of the draft complaint? Absolutely. The draft complaint had nothing to do with Mr. Castro's prior successful phone business. I see. It had to do with the internet kiosk. You named his prior company. Pardon me? You knew it named his prior company. Well, it named Sunbelt Marketing to the extent that company was involved in the internet kiosk business. Yes. It was also the one that did the phone business. It rolled over the phone to the internet, right? There was a program that did that. But essentially, as Mr. Castro indicated in his declaration, what happened is the payphone business, which 15, 20 years ago was a successful business because of the onslaught of cellular telephones, was not a successful business anymore. So in 2001, 2002, he moved out of that business to the internet kiosk business. Okay. All right. Thank you very much. Thank you. All right. The case argued is submitted. Thank you for the arguments. And we'll stand in recess for the day.
judges: Pallmeyer, Rymer, Fisher